UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
LOURDES FONSECA,                    : 12 Civ. 5527 (PAE) (JCF)
                                    :
             Plaintiff,             :        REPORT AND
                                    :     RECOMMENDATION
    - against -                     :
                                    :
COMMISSIONER OF SOCIAL SECURITY,    :
                                    :
             Defendant.             :
- - - - - - - - - - - - - - - - - -:
TO THE HONORABLE PAUL A. ENGELMAYER, U.S.D.J.:

        The plaintiff, Lourdes Fonseca, brings this action pursuant to

section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. §

405(g), seeking review of a determination of the Commissioner of

the Social Security Administration (the "Commissioner").  That

determination affirmed a decision by an Administrative Law Judge

("ALJ"), which found that the plaintiff was not disabled or

entitled to Supplemental Security Income ("SSI") between May 17

1993, and December 31, 1996.

        Ms. Fonseca seeks SSI benefits on the grounds that she suffers

from various physical and mental impairments, including arthritis,

depression, and panic disorder.  She contends that the ALJ's denial

of her application was not supported by substantial evidence.  Each

party has submitted a motion for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure.  For the

reasons that follow, I recommend that the Commissioner's motion be

granted and the plaintiff's motion be denied.

<u>Background</u>

This action arises from the Commissioner's denial of the plaintiff's application for the third time.

A.   <u>Procedural History</u>

On May 17, 1993, Ms. Fonseca filed an application for SSI benefits, which was denied.  (R. at 49-61).[1],[2]  She requested a hearing before an ALJ, and the hearing was held on March 10, 1994. (R. at 17).  On April 4, 1994, the ALJ concluded that the plaintiff was not disabled and was therefore not entitled to SSI benefits. (R. at 17).  Request for review of that decision was denied by the Appeals Council on August 5, 1994.  (R. at 3-4).  The plaintiff then filed a complaint in this Court.  <u>Fonseca v. Commissioner of Social Security</u>, No. 94 Civ. 6901 (S.D.N.Y.).  By stipulation and order entered on February 7, 1996, the Court remanded the case to the Commissioner for further administrative proceedings.  (R. at 332-33).

On remand, a hearing was held on January 15, 1997.  (R. at

---

[1] "R." refers to the administrative record filed with the Commissioner's Answer.

[2] Ms. Fonseca filed a new SSI application on September 2, 1994; the application was denied initially and upon reconsideration.  (R. at 495-96, 498-509, 519-22).  The plaintiff did not appeal, and the issue is not before the Court in this action.

245-87).  The ALJ considered the case <u>de</u> <u>novo</u>, and on February 13, 1997, issued a decision again finding that Ms. Fonseca was not disabled.  (R. at 214-33).  On May 31, 1997, the Appeals Council declined to consider the plaintiff's untimely request for review, rendering the ALJ's determination the final decision of the Commissioner.  (R. at 202-03, 206-08, 210-11).

On May 25, 2010, the Commissioner served and filed the supplemental certified administrative record.  (<u>Fonseca</u>, No. 94 Civ. 6901, Docket No. 18).  By stipulation and order dated July 13, 2010, the Court again remanded the case to the Commissioner for further administrative proceedings.  (<u>Fonseca</u>, No. 94 Civ. 6901, Docket No. 20; R. at 510-11, 512-16).

On remand, a hearing was held on July 29, 2011.  (R. at 639-665).  On August 25, 2011, the ALJ issued a decision finding that the plaintiff was not disabled in the period between May 17, 1993, and December 31, 1996.[3]  (R. at 483-94).  On June 25, 2012, the Appeals Council declined to address the plaintiff's untimely request for review of the ALJ's decision, rendering the ALJ's

---

[3] The ALJ's decision erroneously states that the plaintiff was not disabled from 1993 until December 31, 2006.  However, based on an application filed on June 18, 1997, the Social Security Administration ("SSA") found that the plaintiff was disabled as of January 1, 1997.  (R. at 497).  This finding was not disturbed by the decision under review and is not an issue before the Court. (Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Memo.") at 2 n.1).

decision the final decision of the Commissioner. (R. at 470-72). The plaintiff then commenced this action.

A. <u>Personal Background</u>

Ms. Fonseca was born on March 13, 1962, and attended school through the eighth grade. (R. at 49, 95). She has never been gainfully employed. (R. at 31, 95). At the time of her first administrative hearing in 1994, she was living with her two children, ages eight and sixteen. (R. at 30).

B. <u>Medical Evidence</u>

1. <u>Physical Impairments</u>

a. <u>Arthritis and Pain</u>

Dr. Mark Eberle, a physician at Bellevue Hospital ("Bellevue"), evaluated and treated Ms. Fonseca during the period in question for various complaints of pain. The plaintiff initially had various complaints of musculoskeletal pain, mostly in her heels, plantar fascia,[4] and Achilles tendons. (R. at 128, 129, 341, 564, 566, 598). Physical examination revealed tenderness in those areas, but there was no synovitis,[5] and she had full range of

---

[4] Plantar fascia is a very strong dense fibrous membrane of the sole of the foot that lies beneath the skin and superficial layer of fat and binds together the deeper structures. (http://www.merriam-webster.com/medlineplus/plantar%20fascia (last visited Aug. 27, 2013)).

[5] Synovitis is inflammation of a synovial membrane usually with pain and swelling of the joint. (http://www.merriam-webster.com/medlineplus/synovitis (last visited Aug. 27, 2013)).

motion of her joints.  (R. at 128, 129, 341, 564, 566, 598).

Dr. Eberle diagnosed the plaintiff with arthralgia/polyenthesitis/polytendinitis,[6] undifferentiated connective tissue disease, seronegative polyarthritis, seronegative polyenthesitis, and plantar fasciitis.  (R. at 128, 341, 564, 598). He prescribed Meclomen[7] to treat these conditions.  (R. at 128). By September 1993, the plaintiff reported that she could walk up to two hours before the effects of the medication wore off, and by December 1993, Dr. Eberle noted, her conditions had improved markedly.  (R. at 129, 341, 598).

Ms. Fonseca continued seeing Dr. Eberle in 1994 and 1995 for complaints of pain in various parts of her body, including her neck, right epigastric area, right arm, right knee, Achilles tendons and plantar fascia.  (R. at 342, 344, 384, 604).  On June 29, 1994, he prescribed Elavil for plantar incisional tenderness and possible fibromyalgia syndrome.  (R. at 599).  On August 9,

---

[6] Arthralgia is pain in joint or joints (http://www.merriam-webster.com/medlineplus/arthralgia (last visited Aug. 27, 2013)); enthesitis is inflammation of the tissues in the region of the attachment to a bone (http://www.medify.com/conditions/enthesitis (last visited Aug. 27, 2013)); tendinitis is inflammation of a tendon or tendons (http://www.merriam-webster.com/medlineplus/tendinitis (last visited Aug. 27, 2013)).

[7] Meclofenamate, sold under the brand name of Meclomen, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and other types of mild to moderate pain. (http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682287.html (last visited Aug. 27, 2013)).

5

1994, he reported that she was doing much better, particularly since she started on Elavil.  (R. at 343).  On September 6, 1995, she reported doing "pretty well" and had started physical therapy. (R. at 604).  Dr. Eberle advised the plaintiff to continue with medications and therapy.  (R. at 604).

On July 10, 1996, the plaintiff returned to Dr. Eberle.  (R. at 605).  She was responding well to Meclomen and Elavil but had a new complaint of numbness in her right toe.  (R. at 605).  There was also tenderness of the metatarsal pads and between the third and fourth toes of her right foot.  (R. at 605).  Dr. Eberle assessed possible Morton's neuroma.[8]  (R. at 605).  He continued the plaintiff's medications and advised her to put padding around her third and fourth toes.  (R. at 605).

In a medical report submitted to the Commissioner dated February 23, 1994, Dr. Eberle indicated that Ms. Fonseca had a history of polyarticular joint complaints, mostly in her feet and ankles, and chest pain.  (R. at 148-49).  He indicated that the pain was compatible with seronegative polyarthritis/tendinitis rather than with lupus.[9]  (R. at 148).  He also indicated that the

---

[8] Morton's neuroma is a thickening of the nerve tissue between the third and fourth toe.  (http://www.foothealthfacts.org/footankleinfo/mortons-neuroma.htm (last visited on Aug. 27, 2013)).

[9] In early May 1993, Ms. Fonseca was hospitalized at Bellevue for evaluation and treatment of severe leg pain.  (R. at 131-36). Laboratory work revealed a positive ANA titer, suggesting a

plaintiff had limited ability to walk extensively or stand for a prolonged period. (R. 148). He noted that she had responded well to Meclomen and had modest residual right heel pain with no limitation of movement or evidence of overt inflammation. (R. at 148, 151).

### b.   Asthma

Dr. Eric Ginigar treated the plaintiff at Gouverneur Hopital ("Gouverneur") primarily for asthma. (R. at 147, 152-56, 181-82, 403). On March 8, 1994, responding to a request from the SSA, Dr. Ginigar reported that the plaintiff had chronic asthma with periodic wheezing. (R. at 152). He did not assess her physical abilities. (R. at 154). He also reported that pulmonary function test results indicated mild restrictive disease. (R. at 396, 397).

### c.   Other Aches and Pains

Between April 1994, and June 1996, Ms. Fonseca was seen at Gouverneur for various complaints of pain in her right upper quadrant, joints, neck, and arm, and numbness and tingling in her right shoulder. (R. at 399-400, 402, 408-11).

In September 1994, cervical x-rays showed minimal arthritic changes of the vertebral bodies at C-5. (R. at 409). Physical

---

possibility of autoimmune disorder, particularly systemic lupus erythematosus (SLE) (R. at 131-36, 157, 345-60, 367-68, 372-73, 525-51), but subsequent laboratory work was negative for SLE, and the plaintiff was considered to be seronegative. (R. at 128-29).

examination revealed tenderness in her left neck and shoulder area and limited range of motion in her neck.  (R. at 402).  She was prescribed Tylenol #3 for pain.  (R. at 402).  By December, she had full range of motion in her right shoulder, and her neck was supple, but with pain on extension.  (R. at 410).  She was prescribed Robaxin and Meclomen.  (R. at 410).  In January 1996, she was seen at Gouverneur for a complaint of shooting pain in her right upper back, right neck area, and right arm.  (R. at 430-31).  She had tenderness to palpation of the right cervical area and diminished range of motion due to pain.  (R. at 431).  Her strength was intact and there was no sensory deficit.  (R. at 431).  Dr. Joseph Harris recommended massage, warm compresses, and a neck brace, and prescribed Tylenol #3.  (R. at 431).  On June 25, 1996, Dr. Robert Goldman saw the plaintiff at Gouverneur for a complaint of left side flank pain.  (R. at 432-34).  He noted muscular low back pain and prescribed Meclomen, Flexeril, and physical therapy. (R. at 432).

   2.   Mental Impairments

   During the relevant period, Ms. Fonseca suffered from various psychiatric impairments, including depression, anxiety disorder, and panic attacks.

   Ms. Fonseca was initially interviewed at Gouverneur for reportedly feeling "depressed [and] very angry."  (R. at 398).  She

underwent a series of three screening interviews conducted by Joseph Cohen, M.A., a psychology intern. (R. at 445-53). The examination did not reveal evidence of thought disorder, perceptual disorder, or of current suicidal or homicidal ideation. (R. at 450, 453). Her affect appeared sad with some anxiety, and she was sometimes tearful. (R. at 450). Her abilities to concentrate and pay attention were good, and she was capable of abstract thinking. (R. at 450).

Using the multi-axial system of assessment,[10] Mr. Cohen diagnosed dysthymia on Axis I; nothing on Axis II; asthma, arthritis, deep vein thrombosis, seizure disorder (drug related) and phlebitis on Axis III; moderate to severe stressors on Axis IV; and a GAF[11] of 50 on Axis V. (R. at 452).

Dr. Bruce Beeferman, a psychiatrist at Gouverneur, examined

---

[10] In this system each Axis refers to a different domain of information that may help the clinician to plan treatment and predict outcome. Diagnostic and Statistical Manual of Mental Disorders -- Text Revision ("DSM") at 27 (4th Ed. Rev. 2000). Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psycho-social and environmental problems; and Axis V refers to global assessment functioning ("GAF"). DSM at 27.

[11] GAF is a scale from 0 to 100 that may be used to report the clinician's judgment of an individual's overall symptom severity and level of his functioning. A GAF of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM at 34.

and treated the plaintiff between July 1994 and October 1995. Initially, the plaintiff complained of having panic attacks with claustrophobia and agoraphobia, and Dr. Beeferman prescribed Nortryptiline. (R. at 406). At a follow-up visit on August 25, 1994, he noted that the plaintiff was still experiencing panic attacks but was otherwise maintaining normal affect. (R. at 406). The plaintiff reported no longer having panic attacks by October 1994. (R. at 458). She returned in December 1994 and reported having had a panic attack about a month before and feeling depressed because of physical pain. (R. at 458). She wanted to reduce the dose of Nortiptyline due to sedation, but Dr. Beeferman advised her to take full dose at bedtime to take advantage of the sedative side effects. (R. at 458).

After a five-month break, Ms. Fonseca returned to see Dr. Beeferman on May 11, 1995. (R. at 458). She stated that she had been busy dealing with problems with her son and complained of depression and lethargy. (R. at 458). She had not taken Nortryptyline for the past five months but had been taking Elavil for pain relief. (R. at 458). Dr. Beeferman increased her dose of Elavil for anti-depressive effects. (R. at 458). On May 24, 1995, he noted that she had less pain and improved sleep on the increased dosage of Elavil. (R. at 459). During this visit, she reported having poor energy level and having crying spells. (R. at 459).

10

On June 20, 1995, he noted that the plaintiff reported crying less, being less depressed, and sleeping well on Elavil. (R. at 459). On October 5, 1995, he reported that the plaintiff was doing better as her pain from arthritis had decreased. (R. at 460). He also indicated that the plaintiff was seeking disability secondary to her arthritis and that he informed her of his opinion that psychiatrically he did not deem her appropriate for disability. (R. at 460). He left open the possibility that her medical conditions may qualify her for disability. (R. at 460).

During this time period, Ms. Fonseca met with a social worker, Rita Gazarik, for both individual counseling and group therapy. (R. at 459-61). The notes from those sessions reflect that at a group session on July 25, 1995, the plaintiff reported that her arthritis had not been painful "this summer" and that in September 1995, she reported that physical therapy had been very helpful. (R. at 459, 461).

On October 30, 1995, Ms. Gazarik completed a psychiatric report for the SSA, which Dr. Beeferman signed as well. (R. at 375-78). The report assessed dysthymia and panic disorder on Axis I; no diagnosis on Axis II; arthritis, asthma, seizure disorder, deep vein thrombosis and phlebitis on Axis III; moderate stressors on Axis IV; and GAF of 50 on Axis V. (R. at 375). The report noted that on her most recent mental status examination, which took

11

place that month, Ms. Fonseca appeared calmer, more relaxed, and less tense due to medication. (R. at 375). She still had some anxiety and was continuing to have problems with her daughter. (R. at 375).

According to the report, the combination of Ms. Fonseca's physical and emotional issues caused a marked impairment of the plaintiff's ability to perform activities of daily living. (R. at 376). She also had mild difficulties in social functioning. (R. at 376). Ms. Gazarik noted that when the plaintiff was tired or in pain, she felt depressed at the hopelessness of her situation and experienced panic attacks because of the lack of relief in sight. (R. at 376). Ms. Gazarik also noted that the plaintiff's asthma and arthritis interfered with her abilities to care for her family and keep her appointments, which in turn increased her long-standing history of anxiety and depression. (R. at 377). Ms. Gazarik noted that Ms. Fonseca's condition could make it difficult for her to follow-through on tasks when she was not physically well. (R. at 377). She also indicated that the plaintiff's "physical and emotional condition[s,] which are intermingled[,] are of long duration and will require time for rehabilitation which has begun." (R. at 378). Nevertheless, the report concludes that Ms. Fonseca had the ability to make occupational adjustments (i.e., to understand, carry out, and remember instructions; respond

appropriately to a supervisor and co-workers; and handle customary work pressures in a private work setting).  (R. at 378).

Ms. Fonseca had one more session with Ms. Gazarik on April 17, 1996.  (R. at 461-462).  The plaintiff reported that she was doing well.  (R. at 462).  After this session, the plaintiff's case was closed.  (R. at 462).

In a letter dated April 30, 1997, Dr. Kristin Beizai of Gouverneur provided her assessment of Ms. Fonseca's condition.  (R. at 209).  Dr. Beizai began treating Ms. Fonseca on January 14, 1997 -- after the end of the period in question -- and had seen her monthly.  (R. at 209).  According to Dr. Beizai, "Ms. Fonseca's depression and other psychiatric disorders stem largely from her physical problems, most notably her painful arthritis"; she experiences "severe effects of her depression 3-4 days each week," and she "has several panic attacks per week."  (R. at 209).  Dr. Beizai concluded that "Ms. Fonseca's depression and frequent panic attacks, particularly as they prevent use of public transportation, clearly interfere with her ability to work."  (R. at 209).

    B.   Testimony During July 29, 2011 Administrative Hearing

        1.   Medical Expert Testimony

Dr. Plotz, a rheumatologist, reviewed the record and testified

at the July 29, 2011 administrative hearing.[12]  (R. at 639, 643-49).
He explained that while the plaintiff initially had a positive ANA,
subsequent tests for SLE were negative, leading him to conclude
that she did not have lupus.  (R. at 643).  He stated that the
records showed mild bronchial asthma with some expiratory wheezing.
(R. at 643).  He also stated that the plaintiff had an episode
suggestive of seizures, but the lab tests were negative for
epilepsy.  (R. at 644).

Regarding the plaintiff's aches and pains, Dr. Plotz believed
that they were non-specific and not explained by any medically-
determinable physical impairment.  (R. at 644).  He acknowledged
that the record contained a diagnosis of polyarticular arthritis,
but, in his opinion, Ms. Fonseca had minimal arthritis, not to the
disabling degree that would have affected her activities of daily
living.  (R. at 645).  In addition, her complaints of plantar
fasciitis could be treated easily with appropriate footwear and
local podiatric treatment, minimizing any physical limitations.
(R. at 645).

As to her other limitations, Dr. Plotz opined that due to mild

---

[12]  The record identifies the medical expert as "Dr. Plots."
(R. at 643).  However, the parties indicate that the proper
spelling is "Plotz."  (Def. Memo. at 15; Memorandum of Law in
Support of Plaintiff's Cross-Motion for Judgment on the Pleadings
("Pl. Memo.") at 10).

asthma, she should not be exposed to heavy "particular matter" or fumes; and due to a vague history of seizures, she should not be exposed to driving or unprotected heights.  (R. at 644-45).

Medical expert Dr. Sharon Grant reviewed the record and testified about Ms. Fonseca's mental impairments.  (R. at 649-655). She opined that the plaintiff had dysthymia, anxiety disorder, and panic disorder which had all improved by April 1996.  (R. at 649-650).  She noted that the plaintiff was prescribed Elavil and Zoloft and saw a social worker for therapy.  (R. at 650).  She opined that while the plaintiff had moderate limitations in activities of daily living and in social functioning, her mental impairments did not render her disabled.  (R. at 650-51).  Dr. Grant noted that the plaintiff may have difficulty traveling during rush hour.  (R. at 651).

Dr. Grant concluded that the plaintiff would need to be in a low to moderate stress environment and would not be able to travel during rush hour by public transportation because crowds brought on panic.  (R. at 651).  She further opined that given the impact of Ms. Fonseca's pain and alleged forgetfulness, she should be limited to routine tasks.  (R. at 655).

Dr. Grant noted that the GAF assessment of 50 provided by Mr. Cohen reflects his retrospective assessment of Ms. Fonseca's functioning in the past year.  (R. at 653).  Accordingly, Dr. Grant

15

observed, the score was based on the plaintiff's self-reporting.
(R. at 653-54).  Dr. Grant also noted that GAF, in general, is an
overall assessment of functioning and is rather subjective.  (R. at
654).

### 2.  Vocational Expert Testimony

Vocational   expert   Raymond   Cestar   testified   regarding
employment  that  Ms.  Fonseca  could  obtain  given  her  residual
functional capacity.  (R. at 660-62).  The ALJ asked Mr. Cestar to
consider a hypothetical individual of Ms. Fonseca's age, education,
and  lack  of  prior  work  experience,  and  to  assume  that  she  was
limited to light and sedentary exertion and could perform simple
and routine tasks that were low stress in nature.  (R. at 660-61).

Mr.  Cestar  responded  that  such  a  person  would  be  able  to
perform  unskilled  light  jobs  such  as  cafeteria  attendant,
housekeeper, photocopy machine operator, clerical worker, account
clerk, and assembler.  (R. at 661-62).

### Discussion

#### A.  Determination of Disability

A claimant is disabled under the Act and therefore entitled to
disability benefits if she can demonstrate that she is unable to
"engage  in  any  substantial  gainful  activity  by  reason  of  any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009); Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000). The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). Next, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); see 20 C.F.R. § 404.1520(a)(4)(ii). Third, if the impairment is listed in 20 C.F.R. § 404, Subpt. P, App. 1 or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d). If, however, the claimant's impairment is neither listed nor equal to any listed impairment, she must prove that she does not have the residual functional capacity to

perform her past work.   20 C.F.R. § 404.1520(a)(4)(iv), (e);
Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23
(S.D.N.Y. Jan. 7, 2009) (quoting Bush v. Shalala, 94 F.3d 40, 44-45
(2d Cir. 1996).  Finally, if the claimant satisfies her burden of
proof on the first four steps, the burden shifts to the
Commissioner to demonstrate that there is alternative substantial
gainful employment in the national economy that the claimant can
perform.   20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi, 2009 WL
50140, at *23 (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.
1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).

In assessing whether there is alternative substantial gainful
employment, the ALJ must consider the plaintiff's residual
functional capacity to perform work other than her past job.  The
residual functional capacity "is the most [a claimant] can still do
despite [her] limitations" in terms of work-related physical and
mental activities.  20 C.F.R. § 404.1545(a)(1).  When determining
a claimant's residual functional capacity, the ALJ must consider
the totality of the record, giving due weight to every medical
opinion, regardless of its source.  20 C.F.R. § 404.1527.  The
Commissioner must consider objective medical facts, diagnoses or
medical opinions based on these facts, subjective evidence of pain
or disability, and the claimant's educational background, age, and
work experience.  Hahn, 2009 WL 1490775, at *7; see also Brown v.

18

<u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam).  At each stage of his evaluation, the ALJ must explain his analysis and address all pertinent evidence.  <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

   B.   <u>ALJ's Decision</u>

   The ALJ evaluated the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act between May 17, 1993, and December 31, 1996.  (R. at 494).

   At step one, the ALJ found that Ms. Fonseca had not engaged in substantial gainful activity during the relevant period.  (R. at 493).  At step two, he determined that she had severe impairments consisting of mild asthma and mild obesity during the entire relevant period, and in addition, dysthymia and panic disorder starting in or about April 1994.  (R. at 493).  However, the ALJ concluded at step three that none of the impairments, nor any combination of those impairments, was of a severity to meet or medically equal one of the listed impairments in Appendix 1 of the regulations.  (R. at 493).  In reaching his conclusion, the ALJ noted that Ms. Fonseca's allegations regarding the severity of her symptoms and the degree of her functional limitations during the

19

relevant period were not fully credible, and that she did not have any proven medically-determinable impairment that could be expected cause the alleged symptoms.  (R. at 493).

At step four, the ALJ determined that Ms. Fonseca had no limitations for the exertional requirements of work, but that she was restricted from working in environments with high levels of respiratory irritants due to her asthma.  (R. at 493).  He also determined that starting in or about April 1994, the plaintiff was "unable to perform highly stressful work tasks but was able to perform low stress and even ordinary-stress work tasks."  (R. at 493).

Finally, at step five, based on Ms. Fonseca's "age, education, lack of work experience, and residual functional capacity," the ALJ concluded that "jobs existed in significant numbers in the national economy that she could have performed" during the relevant period, including cafeteria attendant, cleaner or housekeeper, photocopy machine operator, clerical worker, account clerk, and sedentary assembler.  (R. at 494).

C.   <u>Standard of Review</u>

A federal court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence."  <u>Hahn</u>, 2009 WL 1490775, at *6 (internal quotation marks omitted); <u>see also</u>

Longbardi, 2009 WL 50140, at *21; Bonet v. Astrue, No. 05 Civ.
2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008). Judicial
review, therefore, involves two levels of inquiry. First, the
court must decide whether the Commissioner applied the correct
legal standard; second, the court must decide whether the ALJ's
decision was supported by substantial evidence. Tejada v. Apfel,
167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ.
4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008).

Substantial evidence in this context is "'more than a mere
scintilla. It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'" Hahn, 2009 WL
1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401
(1971)); accord Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir.
2004) (quoting Richardson, 402 U.S. at 401). "In determining
whether substantial evidence exists, a reviewing court must
consider the whole record, examining the evidence from both sides,
because an analysis of the substantiality of the evidence must also
include that which detracts from its weight." Longbardi, 2009 WL
50140, at *21; see also Brown, 174 F.3d at 62. "If substantial
evidence supports the Commissioner's decision, then it must be
upheld, even if substantial evidence also supports the contrary
result." Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at
*3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d

21

122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).

The plaintiff challenges the ALJ's decision on the ground that the ALJ's decision is "without substantial support in the record." (Pl. Memo. at 18).[13]   She argues that the ALJ misattributes, mischaracterizes, and omits relevant evidence including aspects of the reports of Dr. Beeferman, Ms. Gazarik, Dr. Grant, and Dr. Beizai.  (Pl. Memo. at 20-25).  These individuals had all provided evidence regarding Ms. Fonseca's mental impairments.

   D.   Ms. Fonseca's Claims

      1.   Dr. Beeferman

The ALJ placed controlling weight on the statement by Ms. Fonseca's treating psychiatrist, Dr. Beeferman, in determining that the plaintiff was not disabled between May 1993 and December 1997. Among other things, the ALJ relied on Dr. Beeferman's statement that he informed Ms. Fonseca of his opinion that "psychiatrically[,] she is not . . . deemed appropriate for disability."  (R. at 460, 492).  The plaintiff argues that the ALJ's reliance on the statement was improper because Dr. Beeferman

---

   [13] The plaintiff's memorandum is not paginated; thus, I will refer to the pages in the memorandum as numbered by the Case Management/Electronic Case Filing (CM/ECF) system.

actually endorsed the view that the plaintiff was disabled. (Pl. Memo. at 21). This claim is without merit.

The plaintiff relies on Dr. Beeferman's statement following the sentence quoted immediately above. After reporting his opinion from a psychiatric point of view, he stated that, "medically[,] [secondary to] arthritis[,] she may [have a disability]." (R. at 460). She contends that this statement demonstrates Dr. Beeferman's view that she was disabled. However, Dr. Beeferman was plainly suggesting the possibility that the plaintiff could have a disability due to her arthritis. She informed him that her "arthritis physician [wa]s filling out papers for disability from arthritis standpoint" (R. at 460), and since this medical condition was outside the scope of his expertise and the treatment relationship, Dr. Beeferman simply did not foreclose that possibility. Thus, read in context, Dr. Beeferman was referring to the possibility that the physician treating Ms. Fonseca for arthritis may have considered that impairment disabling.

This conclusion is also consistent with the rest of Dr. Beeferman's treatment record for Ms. Fonseca. While the plaintiff visited Dr. Beeferman multiple times for complaints of various mental impairments, Dr. Beeferman reported that she had responded well to medications and that her conditions improved over time. He noted the plaintiff's complaints of panic attacks in July 1994, but

by October 1994, he observed an improved anxiety level and the absence of current panic symptoms. (R. at 458). In addition, in December 1994, the plaintiff acknowledged having only a single episode of panic one month earlier. (R. at 458). Notably, after December 1994, the plaintiff sought no psychiatric treatment for six months. (R. at 458). When she returned for treatment of depression in May 1995, she reported that for the past five months she had not taken the medication she had been prescribed. (R. at 458). When the treatment resumed, she had improved by the following month. (R. at 459). Importantly, a report cosigned by Dr. Beeferman and Ms. Gazarik[14] indicates that while Ms. Fonseca had some limitations, they ultimately believed that the plaintiff had the ability to make occupational adjustments (i.e., to understand, carry out, and remember instructions; respond appropriately to supervisors and co-workers; and handle customary work pressures in a private work setting). (R. at 378).

2.  Ms. Gazarik

The plaintiff contends that the ALJ disregarded Ms. Gazarik's assessment of the combined effects of her pain and her psychiatric impairments on her functioning. (Pl. Memo. at 23). However, this

---

[14] The plaintiff correctly points out that the ALJ overlooked the fact that Dr. Beeferman cosigned the report prepared by Ms. Gazarik. (R. at 378, 492).

24

argument ignores the fact, discussed above, that the report ultimately concluded that Ms. Fonseca had the ability to make occupational adjustments, indicating that she was not disabled.

       3.   <u>Dr. Grant</u>

The plaintiff argues that the ALJ erroneously relied on the testimony of Dr. Grant,[15] a psychologist.  Dr. Grant testified that Ms. Fonseca had been diagnosed with dysthymia and explained, among other things, that this diagnosis required fewer signs and symptoms of depression than major depression.  (R. at 658).  Ms. Fonseca argues that Dr. Grant's understanding of dysthymia is not in accord with the "DSM-5."  (Pl. Memo. at 26).

As an initial matter, the plaintiff cites the fifth edition of the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, which was only published on May 22, 2013, well after the decision of the Commissioner.  <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-5</u>") (5th ed. 2013).  The <u>DSM-5</u> renames dysthmia as "Persistent Depressive Disorder," and states, "The degree to which persistent depressive disorder impacts social and occupational functioning is likely to vary widely, but effects can be as great or greater than those of major depression."  <u>DSM-5</u> at 169-70.  The plaintiff does not explain how the new definition would have

---

     [15]  The plaintiff identifies this medical expert as "Dr. Grand."  (Pl. Memo. at 11, 26).

affected Dr. Grant's analysis.

In any event, Dr. Grant did not base his testimony on a clinical definition of dysthymia but on the evidence in the record concerning the impact of Ms. Fonseca's psychiatric impairments on her functioning. In Dr. Grant's opinion, the record shows that the plaintiff's dysthymia, anxiety disorder, and panic disorder improved with treatment, particularly with medication, and that her conditions deteriorated when she stopped treatment. (R. at 649-50, 653). Further, the overall record supports Dr. Grant's opinion that the plaintiff needed to avoid only highly stressful work tasks. (R. at 651, 655). As the ALJ noted, rather than a condition of permanent disability, the plaintiff's condition was marked by a pattern of treatable symptoms that improve with medication and therapy and deteriorate when she stops treatment. (R. at 490).

Accordingly, the plaintiff's argument that the ALJ erroneously relied on Dr. Grant's testimony is meritless.

### 4. Dr. Beizai

Lastly, the plaintiff argues that the ALJ improperly omitted the most recent evidence in the record regarding Ms. Fonseca's mental condition. (Pl. Memo. at 24). She argues that Dr. Beizai, who treated her beginning in January 1997 -- after the end of the period in question -- states in a letter that Ms. Fonseca's

psychiatric impairments render her disabled.

To be sure, a report that post-dates the period at issue may be "pertinent evidence in that it may disclose the severity and continuity of impairment existing before [the date in question]." Parker v. Harris, 626 F.2d 225, 232 (2d Cir. 1980) (internal quotation marks omitted).  In Parker, while the report post-dated the period at issue, the preparer of the report had treated the claimant during the relevant period, and the report clearly referred to the claimant's condition during that period.  Id. Here, Dr. Beizai did not examine Ms. Fonseca until after the end of the relevant period, and her report expresses no opinion as to Ms. Fonseca's disability during the relevant time period.  (R. at 209). In light of substantial evidence supporting the conclusion that Ms. Fonseca was not disabled during the period in question and the fact that this letter does not address her condition during that period, Dr. Beizai's letter does not undermine the Commissioner's conclusion.  See Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991) (medical report that provides assessment of claimant's current disability but is silent as to any earlier period does not support claim of disability as to earlier period).

Ms. Fonseca argues that the ALJ's "failure to identify and discuss [Dr. Beizai's] report breaches the ALJ's duty to examine all the evidence in a claimant's case file . . . and carefully

27

weigh it to determine its value." (Pl. Memo. at 25) (internal quotation marks omitted). While an ALJ's determination "must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence," Ferraris, 728 F.2d at 587, the ALJ is not required to "mention[] every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability," Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983); see also Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) (rejecting argument that ALJ must explicitly reconcile every shred of conflicting testimony).

Here, the ALJ's decision provides sufficient specificity to show that his finding is supported by substantial evidence. See Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983) ("[T]he propriety of agency action must be evaluated on the basis of stated reasons."). As discussed, the ALJ sufficiently addressed critical medical evidence from the period in question, all of which pointed to the conclusion that Ms. Fonseca was not disabled. Dr. Beizai's letter, which post-dates the period in question and does not discuss the plaintiff's condition during the relevant period, was not the type of evidence that required explanation.

Conclusion

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be granted and that the plaintiff's cross-motion be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Engelmayer, Room 2201, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
        September 4, 2013

Copies mailed this date to:

William P. Gottlieb, Esq.
Axelrod and Gottlieb
100 Lafayette Street, Suite 304
New York, NY 10013

Leslie A. Ramirez-Fisher, Esq.
Assistant U.S. Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007